**Alfred LEWIS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 140, 2010.**

Supreme Court of Delaware.

Submitted: Feb. 17, 2011.
Decided: May 12, 2011.
Reargument Denied June 13, 2011.

Robert M. Goff, Jr., Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

Gregory E. Smith, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, JACOBS, RIDGELY, Justices, and NEWELL, Judge [1] (constituting the Court en Banc).

HOLLAND, Justice:

The final re-indictment in this case charged the defendant-appellant, Alfred Lewis ("Lewis") with the following crimes: Attempted Murder in the First Degree of Terrell Loper ("Loper"), Reckless Endangering in the First Degree of Vance Moore ("Moore") on November 3, 2006, and the firearm charges associated with that event; Attempted Murder in the First Degree of Emmanuel Southerland ("Southerland") on November 4, 2006, and the firearm charges connected with that crime; Aggravated Menacing by Firearm of Southerland on January 3, 2007. Lewis was also charged with Aggravated Intimidation of a Witness; one count each for conduct allegedly directed at witnesses Loper, Moore, and Southerland for conduct between January 12, 2007 and November 28, 2007 (the first trial date of the attempted murder case); one count each of Criminally Soliciting Ashley Foreman ("Foreman") and Victoria Ponzo ("Ponzo") to commit intimidation of witnesses; and finally, Disregarding a Police Officer, Resisting Arrest and Reckless driving, related to the December 9, 2008, arrest of Lewis during his fugitive status and return of a trial capias.

Lewis pled not guilty and the nineteen counts of the re-indictment proceeded to a jury trial in the Superior Court. Following the presentation of the State's case, the trial judge acquitted Lewis of the Reckless Endangering and Companion Weapon charges related to Moore. He also acquitted Lewis of the weapons charges and reduced to simple menacing the charge arising from January 12, 2007

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4.

involving the alleged victim Southerland. The trial judge acquitted Lewis of two aggravated intimidation charges and one solicitation charge and reduced the remaining aggravated intimidation to simple intimidation.

The jury returned verdicts on all twelve of the remaining charges, finding Lewis guilty of the November 3, 2006 attempt to murder Loper, not guilty of the November 4, 2006 attempt to murder Southerland, not guilty of menacing Southerland on January 12, 2007, guilty of intimidation of a witness and of soliciting another to do the same, and guilty of the three offenses related to Lewis' final arrest. A timely motion for a new trial was denied. The trial judge sentenced Lewis to twenty-nine years, five months and ten days in prison followed by probation. At that time, Lewis was already serving a ten year sentence on drug and weapon charges associated with the events of his final arrest.

In this direct appeal, Lewis claims that the trial judge abused his discretion when he decided that a single complaint by the jury during trial—that some members had difficulty hearing one videotaped section 3507 statement—justified departure from the general default rule that such statements do not go into the jury room during deliberations. In support of that argument, Lewis contends that the trial judge erred by ordering all four of the separate videotaped witness section 3507 statements to be with the jury during its deliberations, despite an agreement between the parties to the contrary. Lewis submits that the centrality and prejudicial nature of those recorded section 3507 statements, as opposed to the exculpatory in-court testimony of the four witnesses who made them, requires a new trial.

We have concluded that Lewis' arguments are correct. The Superior Court judgments must be reversed, and this matter remanded for a new trial.

### Facts

On November 3, 2006, at around 3 o'clock in the afternoon, the Wilmington police arrived at a residence in the 800 block on North Madison Street in response to a "shots fired" complaint. The police found Loper lying in the foyer of that residence with a female holding a bloody towel to the gunshot wound in the back of his head. An ambulance took Loper to the hospital. Evidence detection officers photographed and videotaped the area as they searched for evidence in the 700 block of Eighth Street between Monroe and Madison. They found numerous spent bullet casings and several bullet holes in nearby vehicles.

### Trial Proceedings

The State called four eyewitnesses to testify about the November 3rd shooting as well as the events leading up to it. They were Linda Meades ("Meades"), Marshall Person ("Person"), Demetrius Mayo ("Mayo") and the victim, Loper. All of those persons were described by the State as turncoat witnesses because their testimony at trial was contrary to the prosecution favorable pretrial statements that each of them gave to the police.

T–Diddy, as Loper was known on the street, recovered from his wound and testified reluctantly on behalf of the State at the trial. He remembered being shot and identified a picture of himself in that condition. He admitted speaking to the police, but denied that he remembered speaking to Detective Curley, with whom he had conducted a videotaped interview. Loper denied that he could identify who shot him, and testified that he did not know Lewis. At trial, Loper testified that when he was shot, his back was turned while he was talking to his cousin Sharon.

The State played Loper's videotaped statement of January 2, 2007 and introduced it into evidence pursuant to title 11, section 3507 of the Delaware Code. In the course of that statement, Detective Curley had shown Loper three different photographic line-ups, one of which contained a picture of Lewis. In his pretrial statement to Detective Curley, Loper identified Lewis as the person who shot him and who had arrived at the crime scene in a white Nissan Maxima automobile. In his pretrial statement, Loper also identified Marshall "Man" Person as being in a gold Cadillac at the shooting scene.

After the videotape was played before the jury, Loper maintained that he still did not see who shot him. Although he did admit that he had circled Lewis' picture, Loper testified that the police officer had suggested Lewis by saying his name. There is no indication in the record that the jury did not or could not hear or understand the videotaped section 3507 statement of Loper.

The State also called Meades as a witness. She testified that on the day that Loper was shot, she was on the steps of her house when she heard gunshots and ran into the house with her grandchildren. She saw two people on the street shooting and recalled that they were black, but she could not recall whether they were female or male. She also recalled speaking to Detective Curley that day.

In her taped section 3507 statement to Detective Curley, Meades said that she saw a white Maxima and a silver Cadillac with two people outside shooting at Loper. During cross-examination, Meades testified that when she was interviewed by the police, because so many people on the street had volunteered information to her, she may have been giving Detective Curley some information she had heard from those other people after the shooting.

There is no indication in the record that the jury did not or could not hear or understand the taped section 3507 statement of Meades.

The State also called Person as a witness. Person testified that he was in an SUV by himself, heard the shots and left. He did not see the shooting and could not identify the shooter because he was too busy trying to escape. In his section 3507 statement to Detective Curley, Person said that he thought he was going to a fistfight but that it turned into a shooting. In his section 3507 statement, Person pointed to Lewis' picture in the photo line-up as a person whom he saw doing the shooting.

After his videotaped section 3507 statement was played before the jury, the trial judge reported, "The jury has complained to the bailiff that they are not picking up on what's being said in this video that was being played. I'm not sure what to say beyond that." The trial judge then made it clear that "this video" was referring to the video of Person. The judge told the jury that they would reposition the microphone to improve the sound, and to advise him if there were further problems with other tapes. The record does not reflect any further problems. Neither the jury nor the parties asked for Person's taped statement to be replayed in whole or in part.

After Person's videotaped section 3507 statement was played, during cross-examination, Person testified that when the police came to his house, they had a search warrant. He said the police were looking for a gun in his house but did not find one. He further testified that he was not arrested and that the police told him to say Lewis had committed the crime, and that the police brought up his name first.

Mayo was the State's final witness to the Loper shooting. Mayo testified on direct

examination that he frequents the area of Fifth and Jefferson Streets in Wilmington and did not really remember anything concerning a shooting. He did remember speaking to two detectives at New Castle County Headquarters, but denied knowing Lewis or hearing a shooting take place on November 3, 2006.

In Mayo's videotaped section 3507 statement that was played for the jury, he told the police that Loper had bought bad dope from Lewis and that they would not allow Lewis to come to the area of Eighth Street anymore. But, according to Mayo, Lewis did return with several cars and shot up the block. Mayo told Detective Curley that he had seen the vehicles going to that area before the shooting and then coming from the area afterwards, and that he had seen Lewis in a white Maxima the day T–Diddy got shot. There is no indication in the record that the jury did not or could not hear or understand the videotape recorded section 3507 statement of Mayo.

During his testimony after his videotaped section 3507 statement was played for the jury, Mayo explained that what he had told Detective Curley was not true. Rather, Mayo testified, he had heard these things from Derrick "Killer" Braxton, as well as from others. He testified that he told this lie to the police to get himself out of trouble.

### Superior Court Rulings

Following Person's testimony, there was a discussion about whether the section 3507 statements should each go into evidence as a court exhibit and not be given to the jury in deliberation, or as a prosecution exhibit and be available to the jury. Both the prosecution and the defense agreed that all of the various witnesses' section 3507 statements should come into evidence as court exhibits only and not be

given to the jury. The judge declined to accept that agreement and announced that the issue would be addressed later, after he had read this Court's *Flonnory*[2] decision and before the jury began its deliberations. By the end of the day, the judge made a preliminary decision to permit all four of the videotaped section 3507 statements to be sent to the jury room for use during deliberations:

> I have reread *Flonnory* and the Court very much appreciates the disfavor with which the State Supreme Court views bringing into the jury room either the videotaped statements or transcripts of 3507 statements, but the court also is aware that the rule in *Flonnory* is not absolute, and my preliminary thinking on this is [if] ever there were a good exception to that rule ... it very well may be the situation where the jury has complained during the presentation of a 3507 statement that it could not hear all of what was being said, and the court, having seen the statement and understanding the limitations of the statement, it would seem to me that the best way for the jury to understand the 3507 statement would have been if the State had put together a transcript, which it did not do, but failing that, then the best way to deal with this is for the jury to try and work through the statement in the jury room with the court, of course, providing the cautionary instruction about not overemphasizing what is taken into the jury room as against the things that are not, but tentatively, I'm thinking that in weighing the risk of unfair prejudice due to the improper balancing of testimony, as I just mentioned, against the probative value on taking the jury's complaint into effect, I'm coming down right now on the idea that this is a

2. *Flonnory v. State,* 893 A.2d 507 (Del.2006).

perfect example of an exception to the *Flonnory* default rule.

The next day, while discussing the admission of other evidence, the trial judge stated that his final ruling was that all four of the section 3507 statements would go to the jury room during the jury's deliberations. The trial judge concluded "if the jury wants to take the 3507 statement and play it slowly in the jury room, that's the best way for them to understand what was said." Defense counsel expressed his concern to the trial judge: "[A]s to the November 3rd incident, virtually none of the witnesses provided the State with the necessary evidence live in the courtroom to convict." Defense counsel also complained that "[w]hat we're going to have is the jury receiving the State's case back there and having to remember through the recess of time what was said in the courtroom." The trial judge adhered to his decision and the jury was given all four section 3507 statements when it retired to begin its deliberations.

### Issue on Appeal

The sole issue presented by this appeal is whether the trial judge abused his discretion when he *sua sponte* decided that a complaint from the jury during trial—that they were having some difficulty following one particular videotaped section 3507 statement—justified sending all four of the videotaped section 3507 statements into the jury room for unlimited use during the jury's deliberations.

### Section 3507 Default Rule

Section 3507 provides that "[t]he voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent tes-

timonial value."[3] In *Flonnory,* this Court held:

> As a general matter, recorded or written out-of-court § 3507 statements that are played or read during trial should not be admitted as separate trial exhibits that the jury can take into the jury room during deliberations when all other testimony-including direct and cross-examination testimony of a § 3507 witness, out-of-court § 3507 statements presented by a witness other than the § 3507 declarant, and testimony presented by non-§ 3507 witnesses-are generally not admitted as separate trial exhibits in transcript form after the witness testifies in court. The reason derives from the concern we discussed in *Taylor,* that allowing the jury to have transcripts of trial testimony during their deliberations might result in the jury giving undue emphasis and credence to that portion of the testimony. That concern is equally applicable to written or recorded § 3507 statements that are admitted into evidence as separate exhibits after they have been heard in open court. Thus, we hold that the "default" rule is that written or tape or video-recorded § 3507 statements should *not* be admitted into evidence as separate trial exhibits that go with the jury into the jury room during deliberations although the statements may be played or read to the jury in the first instance during the course of trial.[4]

In *Flonnory,* this Court gave two examples of the circumstances that might justify a judge exercising his discretion to depart from the default rule: first, when the jury makes a request to rehear a section 3507 statement during its deliberation; and second, where the parties do not ob-

---

**3.** Del.Code. Ann. tit. 11, § 3507(a).

**4.** *Flonnory v. State,* 893 A.2d at 526 (citing *Taylor v. State,* 685 A.2d 349 (Del.1996)).

ject to having written or recorded statements go into the jury room as exhibits.[5]

### No Exceptional Circumstances

■ In this case, neither of those exceptional circumstances existed. First, the parties agreed that the statements would be treated as court exhibits and would *not* be sent back with the jury to the deliberation room. Second, the trial judge's decision that all of the section 3507 statements would be available during the jury's deliberations preempted the issue of whether the jury would even ask for one or more of the four videotaped section 3507 statements to be replayed. The record reflects that the jury expressed no concerns during the trial when three of the section 3507 statements were played and did not ask for the "problematic" fourth statement to be replayed during trial.

■ The trial judge's ruling that the jury should be able to "work through the tapes" during its deliberations is inconsistent with the *ratio decidendi* of *Flonnory*. Permitting the jury to "work through the tapes" is exactly the type of overemphasizing this Court was concerned about in *Flonnory*. Once the taped section 3507 statements are played during trial, they should not be available to the jury during their deliberations, absent a prior agreement between the parties or a request from the jury during its deliberations to rehear a section 3507 statement.

■ If the jury does ask to rehear one or more section 3507 statements, the trial judge must exercise discretion at that time in deciding whether to grant the request and under what conditions. In *Flonnory*, we held that "the trial judge's broad discretion in these circumstances is co-extensive with his discretion to allow or to refuse to allow the jury to rehear in-court trial testimony of any witness." [6] If the jury's request to rehear trial testimony is granted, there is usually a *single* reading of that testimony. In *Flonnory*, we noted that when a section 3507 statement is replayed it becomes "testimonial." [7] Accordingly, in the absence of an agreement by both parties, statements should not be given to a jury for unlimited replaying during their deliberations in response to a request for a rehearing.

■ In this case, in denying Lewis' motion for a new trial, the judge stated:

> The court is not troubled by the fact that in this virtually unique situation it sent the 3507 tape recording into the jury room. It was the only way that the jury could scrutinize the tape recording, what was actually said.

That ruling is also inconsistent with our reasoning in *Flonnory* that, as a general rule, a section 3507 statement should be presented in an understandable form only once, which is during the trial. The failure to hear a recorded section 3507 statement in the courtroom should not be an issue. The trial judge should instruct the jury before a recorded section 3507 statement is played to signal promptly if the statement is not audible. If the section 3507 statement is ultimately found to be not understandable during trial, it may not be admissible as evidence. The burden is on the proponent to provide a properly redacted and understandable recorded section 3507 statement. The jury certainly should not be permitted to "work through" the recorded section 3507 statement during their deliberations until it is understandable.

---

**5.** *Id.* at 527.

**6.** *Id.*

**7.** *Id.* at 530 n. 58.

### Error Not Harmless

■ Lewis contends that where, as here, "virtually all of the State's in-court testimonial evidence failed to point toward his guilt, and was, in fact, largely exculpatory, he was denied a fair trial when the prior recorded section 3507 statements that tended to show his guilt were permitted to go to the jury room for unlimited replaying." We agree. That procedure exalted the recorded section 3507 statements above the balance of the evidence in Lewis' trial and unduly emphasized their importance, notwithstanding the trial judge's cautionary instruction to the contrary.

All of the evidence showing that Lewis fired a gun at Loper on November 3, 2006, is found in the four recorded section 3507 statements that were improperly permitted into the jury deliberation room. The centrality of that evidence to the State's case is not disputed. Accordingly, we hold that the undue emphasis placed upon that section 3507 evidence by its unwarranted admission into the jury's deliberative process was not harmless beyond a reasonable doubt.

### *Conclusion*

The judgments of the Superior Court are reversed. This matter is remanded for a new trial.