IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MELVIN L. MORSE, | § | |
| | § | No. 200, 2014 |
| Defendant-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware in and |
| v. | § | for Sussex County |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | ID No. 1208005897 |
| Plaintiff-Below, | § | |
| Appellee. | § | |

Submitted: June 29, 2015
Decided: August 06, 2015

Before **STRINE**, Chief Justice, **VALIHURA**, and **VAUGHN**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Joseph A. Hurley, Esquire, Wilmington, Delaware, for Appellant.

Kathryn J. Garrison, Deputy Attorney General, Department of Justice, Georgetown, Delaware, for Appellee.

1

**VAUGHN**, Justice:

This appeal centers on Defendant-Below/Appellant Melvin L. Morse's ("Melvin") physical abuse of his step-daughter, A.M. Melvin's abusive conduct spanned the course of at least two years and consisted of, *inter alia*, suffocating and "waterboarding" A.M. as punishment for what he deemed to be misbehavior. Melvin was convicted in the Superior Court of Reckless Endangering in the First Degree,[1] Reckless Endangering in the Second Degree,[2] Assault in the Third Degree,[3] and three counts of Endangering the Welfare of a Child.[4] On appeal, Melvin raises two claims.[5] First, he contends that the trial court abused its discretion by admitting evidence of other uncharged abusive acts against A.M. in violation of Delaware Rule of Evidence ("D.R.E.") 403.[6] Second, he contends that the trial court erred in allowing the jury to re-watch videotaped statements of A.M. and her younger sister, M.M., after the jury requested to view them during deliberations.[7] We find no merit to Melvin's claims and affirm.

---

[1] 11 *Del. C.* § 604.
[2] 11 *Del. C.* § 603.
[3] 11 *Del. C.* § 611.
[4] 11 *Del. C.* § 1102.
[5] Melvin originally raised three claims, but abandoned his third claim in his reply brief. Appellant's Rep. Br. at 20.
[6] D.R.E. 403 provides that the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."
[7] *See* 11 *Del. C.* § 3507.

## I. FACTS AND PROCEDURAL HISTORY

On July 12, 2012, Melvin, his wife, Pauline Morse ("Pauline"), then eleven-year old A.M., and her then six-year old sister, M.M., went to pick up food at Grotto Pizza. While at the restaurant, A.M. placed her hands on the glass cover of an ice cream display prompting Melvin to instruct her to wait in the car. Once they arrived home, Melvin told A.M. that she had to stay in the car while the rest of the family went inside to eat dinner. Several hours later, Melvin retrieved A.M. from the car by grabbing her ankle and dragging her across a gravel driveway, up concrete stairs, through the house, and into her room. Melvin then proceeded to hit A.M. repeatedly. The punishment ended with Melvin telling A.M. that the next day he was going to "punish[] [her] like [she's] never been punished."[8] In fear of what Melvin meant by this threat, A.M. woke up early the next morning, packed a bag, and ran away to a friend's house. Shortly thereafter, the friend's mother contacted the police.

A.M. was taken to Beebe Hospital, where she was examined by medical personnel. According to the nurse who treated her, A.M. had a number of cuts and bruises on her body, particularly on her neck, back, right arm, and legs.[9]

---

[8] Appellee's Ans. Br. at Ex. A (Video Statement of Melvin Morse, July 13, 2012). A.M. testified at trial that he said "there will be more." Appellee's Ans. Br. App. at B104.

[9] A.M. and M.M. were placed in foster care shortly thereafter. Appellee's Ans. Br. App. at B86.

Melvin was questioned at the police station. He admitted that he had dragged A.M., but claimed that he was merely trying to move her from the car into the house. He also claimed that it was Pauline who was responsible for disciplining the children and that he had not hit A.M. in years.

Pauline, A.M., and M.M. told a very different story. Both A.M. and M.M. were interviewed separately at the Children's Advocacy Center ("CAC"). During their interviews, both girls described Melvin as a violent disciplinarian who focused his anger on A.M.[10] A.M. explained that, among other inhumane punishments, Melvin would use a punishment technique that he referred to as "waterboarding."[11] Melvin would waterboard A.M. by picking her up, holding her face under a sink faucet, and running water over her nose and mouth so she could not breathe.[12] Although Melvin, a pediatrician, reassured A.M. that she could last five minutes without oxygen, she said that she sometimes feared that he would forget to remove her from the water and kill her. A.M. also revealed that Melvin had on other occasions placed his hand over her mouth and nose, impairing her ability to breathe. M.M. stated in her CAC interview that Melvin would "clean[] [A.M.'s] hair by waterboarding."[13]

---

[10] Appellee's Ans. Br. at Ex. B (CAC Video Statement of A.M., Aug. 6, 2012); Appellee's Ans. Br. at Ex. C. (CAC Video Statement of M.M., Aug. 6, 2012).
[11] Appellee's Ans. Br. at Ex. B (CAC Video Statement of A.M., Aug. 6, 2012).
[12] Appellee's Ans. Br. at Ex. B (CAC Video Statement of A.M., Aug. 6, 2012).
[13] Appellee's Ans. Br. at Ex. C. (CAC Video Statement of M.M., Aug. 6, 2012).

On September 25, 2012, Melvin and Pauline were charged with Assault in the Third Degree, four counts of Reckless Endangering in the First Degree, and five counts of Endangering the Welfare of a Child. The charges related to, *inter alia*, three instances of waterboarding and one of hand suffocation that all took place when A.M. was between ages nine and eleven. Pauline eventually entered into a plea agreement in which she pled guilty to multiple misdemeanors of endangering the welfare of a child and received a period of probation in exchange for testifying against Melvin.

Prior to Melvin's trial, the State filed a motion *in limine* seeking to introduce evidence of Melvin's other abusive acts against A.M. as well as evidence of Melvin's abuse against A.M.'s older sister, S.M., who no longer lived with the family.[14] Melvin opposed this motion, contending that the uncharged acts had no probative value and were highly prejudicial.

Prior to rendering its decision, the trial court held a hearing on the motion *in limine* during which both A.M. and M.M. testified. The court thereafter granted the State's motion as to evidence of Melvin's abuse against A.M. The court found that the uncharged acts of abuse against A.M. were material to an issue in the case, Melvin's state of mind, and properly introduced to show "motive, opportunity,

---

[14] *See* D.R.E. 404(b).

domination, plan, and intent."[15] The court further found that the evidence was "inextricably intertwined with the charges"[16] because the "evidence support[ed] the notion that the charged acts were part and parcel of a punishment regime for [A.M.]'s major crimes as perceived by the defendant."[17] Finally, the Superior Court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice and stated that it would give the jury an instruction as to the extent it could use the other abusive acts evidence.

The court denied, however, the State's motion as to evidence of Melvin's abuse of S.M. In so doing, the trial court stated: "The State advanced a theory that the defendant abused [S.M.] who was younger and later directed his abuse towards [A.M.] when [S.M.] became older and unavailable . . . . This evidence shall not be admitted . . . . The probative value . . . is substantially outweighed by a danger of unfair prejudice."[18]

At trial, the State presented testimonial evidence regarding Melvin's other abusive acts against A.M. in order to establish Melvin's punishment regime. On four separate occasions, the trial court instructed the jury that the evidence of Melvin's other abusive acts could only be used to determine his motive, opportunity, intent, domination, plan, and mental state. The instructions further

---

[15] Appellant's Op. Br. App. at A28.
[16] Appellant's Op. Br. App. at A29.
[17] Appellant's Op. Br. App. at A29.
[18] Appellee's Ans. Br. App. at B65.

6

stated that the jurors were not permitted to conclude that Melvin was a bad person or that he has a tendency to commit criminal acts.

Both A.M. and Pauline testified at trial and detailed Melvin's regular abuse of A.M. They testified that A.M. spent a significant portion of her time at home being punished and that Melvin employed several forms of punishment in addition to "waterboarding." These punishments included depriving A.M. of meals, force-feeding A.M., making A.M. stand for extended periods of time with her arms out, depriving A.M. of sleep, and trying to stick A.M.'s head in a toilet for forgetting to flush.

Melvin also restricted A.M.'s movements around the house, and installed bells on the door of her bedroom so that he would hear if she left her room. He confined her to her room for extended periods of time, forcing her to relieve herself in her toy box instead of the bathroom. There were also other forms of physical and mental punishment that involved Melvin videotaping and photographing A.M. in humiliating and degrading situations. One of the photographs showed A.M. washing her pants after she wet herself when Melvin was suffocating her by hand. A video taken by Melvin was also played for the jury, which shows him lecturing A.M. According to A.M.'s testimony, he used the video to taunt her: "He made me watch it over and over again. He said, 'Look how you cry.'"[19]

---

[19] Appellee's Ans. Br. App. at B37.

As to the waterboarding method of punishment, A.M. testified that Melvin waterboarded her multiple times, either in the kitchen sink or the upstairs bathroom. On one occasion, A.M. vomited after being force-fed, and Melvin waterboarded her as punishment in the bathroom tub. Pauline testified that she had witnessed Melvin waterboarding A.M. once in the kitchen sink.[20] M.M. also testified that she had seen Melvin waterboarding A.M.

The State introduced redacted versions of A.M.'s and M.M.'s videotaped interviews at the CAC as out-of-court statements under 11 *Del. C.* § 3507. The State also introduced into evidence a redacted video showing the police interview with Melvin after his arrest. Melvin did not object to entering any of these videos into evidence.

Melvin also testified at trial. He admitted to dragging A.M. out of the car on the night before his arrest, but denied waterboarding her as a form of punishment. He described in detail A.M.'s difficulties in rinsing soap from her hair when bathing, which he testified resulted in conflicts between Pauline and A.M. Melvin explained that rinsing A.M.'s hair eventually became his duty and that he had used

---

[20] Pauline stated: "He called it washing her hair, but I knew it wasn't washing her hair because there was no soap . . . ." Appellant's Op. Br. App. at A86.

the term "waterboarding" in jest.[21] He also claimed that "the hair rinsing episodes with [A.M.] finished up in about 2009,"[22] when A.M. was eight years old.

During closing arguments, the State informed the jurors that there were statements admitted during trial that would not be provided to them as exhibits for their deliberations. The State briefly referenced the trial judge's jury charge on § 3507 statements and advised the jury that if it wished to see those statements again, it would have to request them. Melvin did not object to this statement.

After deliberations had begun, the jury submitted a note to the trial judge requesting the video of the Morse home prepared by the Delaware State Police, the videotaped CAC interviews of A.M. and M.M., and excerpts of A.M.'s and Pauline's trial testimony related to the waterboarding in the kitchen sink. Melvin objected to allowing the jury to re-watch the videotaped CAC interviews. After considering Melvin's argument, the court decided to replay the videos once, in the courtroom, after repeating the jury instructions on child witnesses, general witness credibility, and § 3507 statements. The trial court also ruled that because it did not have transcripts of the trial testimony available, it would not provide excerpts of A.M.'s and Pauline's testimony to the jury. Melvin did not object to this ruling.

---

[21] Melvin testified that "I used to say—'Gosh, you're acting like I'm torturing you.' And I do know that I said to her, '[A.M.], I'm not waterboarding you. We are just rinsing your hair.'" Appellee's Ans. Br. App. at B169.

[22] Appellee's Ans. Br. App. at B172.

The jury found Melvin guilty of one count of Reckless Endangering in the First Degree, one count of Reckless Endangering in the Second Degree, Assault in the Third Degree, and three counts of Endangering the Welfare of a Child. Melvin was sentenced to ten years in prison, suspended after three years. This appeal followed.

## II.    ANALYSIS

On appeal, Melvin claims that the Superior Court abused its discretion by admitting evidence of Melvin's uncharged abusive behavior against A.M. and by permitting the jury to re-hear the videotaped CAC interviews of A.M. and M.M.

### A. The Superior Court Did Not Abuse Its Discretion by Admitting Evidence of Melvin's Uncharged Abusive Acts under D.R.E. 404(b)

We review for abuse of discretion a trial judge's admission of evidence under D.R.E. 404(b).[23] D.R.E. 404(b) states that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."[24] Thus, evidence relating to a party's uncharged bad acts is not admissible to prove propensity or "support a general

---

[23] *Watson v. State*, 2015 WL 1279958, at *2 (Del. Mar. 19, 2015) (citations omitted); *Campbell v. State*, 974 A.2d 156, 160 (Del. 2009); *Capano v. State*, 781 A.2d 556, 634 (Del. 2001).
[24] D.R.E. 404(b).

inference of bad character."[25]  But the same evidence may be admissible "when it has 'independent logical relevance' and when its probative value is not substantially outweighed by the danger of unfair prejudice."[26]

In *Getz v. State*, this Court established five factors[27] a trial court is to consider before admitting evidence under D.R.E. 404(b): (1) the evidence "must be material to an issue or ultimate fact in dispute;"[28] (2) the evidence must be introduced for a proper purpose,[29] including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident;"[30] (3) the acts must be proved by "plain, clear and conclusive" evidence;[31] (4) the other acts must have been committed "not [] too remote in time from the charged offense;"[32] and (5) the prejudicial effect of the evidence must not substantially outweigh its probative value.[33]

In balancing the probative value and the prejudicial effect of the evidence under the fifth prong of the *Getz* analysis, the trial court must apply the *Deshields* factors to guide its determination:[34]

---

[25] *Getz v. State*, 538 A.2d 726, 730 (Del. 1988) ("A defendant must be tried for what he did, not who he is.").
[26] *Id.* (citing D.R.E. 403; *Diaz v. State*, 508 A.2d 861, 865 (Del. 1986)).
[27] *Id.* at 734.
[28] *Id.*
[29] *Getz*, 538 A.2d at 734.
[30] D.R.E. 404(b).
[31] *Getz*, 538 A.2d at 734 (quoting *Renzi v. State*, 320 A.2d 711, 712 (Del. 1974)).
[32] *Id.*
[33] *Id.*
[34] *Deshields v. State*, 706 A.2d 502, 506-07 (Del. 1998).

11

(1) the extent to which the point to be proved is disputed; (2) the adequacy of proof of the prior conduct; (3) the probative force of the evidence; (4) the proponent's need for the evidence; (5) the availability of less prejudicial proof; (6) the inflammatory or prejudicial effect of the evidence; (7) the similarity of the prior wrong to the charged offense; (8) the effectiveness of limiting instructions; and (9) the extent to which prior act evidence would prolong the proceedings.[35]

Finally, if the evidence is admissible under the five *Getz* factors, the jury should be instructed on the limited purpose for which such evidence is introduced.[36]

Melvin argues that the Superior Court abused its discretion by admitting evidence of his other abusive acts against A.M. Although Melvin fails to contest any specific facet of the Superior Court's analysis, he contends that the cumulative effect of the uncharged abusive acts was unduly prejudicial under D.R.E. 403. He also contends that the evidence should have been excluded under the cumulative error doctrine.

We disagree. First, despite his broad assertions, Melvin has failed to cite any authority suggesting there is a limit to the number of uncharged bad acts that can be introduced at trial. Assuming the requirements of *Getz* and *Deshields* are satisfied, there is no limit to the amount of D.R.E. 404(b) evidence that can be

---

[35] *Id*. at 506-07 (quotation omitted).

[36] *Id*. at 507 (citing *Getz*, 538 A.2d at 730-31, 734). *Getz* provides: "Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105." *Getz*, 538 A.2d at 734. This sixth factor, however, does not weigh in the determination of whether such evidence is admissible. *Id.*

admitted for a proper purpose.[37]    Second, the cumulative error doctrine is inapplicable here. Under the cumulative error doctrine, "[c]umulative error must derive from multiple errors that caused 'actual prejudice.'"[38]    The doctrine is thus not relevant if, as here, each piece of evidence by itself was properly admitted.

We also find no error in the substance of the trial court's D.R.E. 404(b) analysis.    The trial court considered each of the *Getz* factors and correctly determined that the contested evidence was admissible.

As to the first two *Getz* factors, the Superior Court rightly found that evidence of Melvin's uncharged abuse was relevant to a material issue in dispute: Melvin's state of mind in waterboarding A.M.[39]    Both before and during trial, Melvin disputed the assertion that there was any malice in his self-proclaimed "waterboarding" of A.M.    Instead, he claimed that he was merely washing A.M.'s hair and "caring for [her] as any good stepfather would."[40]    The burden lay with the State to show beyond a reasonable doubt that Melvin possessed the requisite

---

[37] Melvin cites *Dickens v. State*, 437 A.2d 159 (Del. 1981), for the proposition that materiality "is diminished by the cumulative nature of the evidence."  Appellant's Rep. Br. at 5.  But this Court affirmed the trial court's decision to admit the contested evidence in *Dickens*, stating: "While the defense may have conceded the issue of intent, the State still had to prove each element of the crime, and slides of a victim's wound are relevant to and probative of the issue of intent."  *Id.* at 163 (internal citations omitted).

[38] *Michaels v. State*, 970 A.2d 223, 231 (Del. 2009) (quotation omitted).

[39] A dispute as to whether a defendant possessed the requisite mental state is the type of independent and logical relevance that justifies admitting evidence of uncharged bad acts.  *See Huddleston v. United States*, 485 U.S. 681, 685 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

[40] Appellee's Ans. Br. App. at B55.

13

mental state for the crimes of which he was charged.[41] Evidence of Melvin's uncharged abuse of A.M. was undoubtedly relevant in helping the jury determine his state of mind when he was "waterboarding" his step-daughter.

The trial court further found that evidence of the uncharged acts of abuse was being admitted for several proper purposes, which included: "show[ing] motive, opportunity, that is, [Melvin's] domination of [A.M.], the alleged victim, and intent."[42] We agree and find that the uncharged incidents establishing Melvin's punishment regime were relevant,[43] material to an issue in dispute,[44] and introduced for a proper purpose.[45]

The third and fourth factors of the *Getz* analysis were also satisfied. The evidence of Melvin's abuse of A.M. was "plain, clear and conclusive" as it was established by eyewitness testimony, as well as photographs and videos of

---

[41] To meet its burden to prove that Melvin had recklessly endangered A.M. and endangered her welfare, the State had to prove beyond a reasonable doubt that Melvin "recklessly engage[d] in conduct which created a substantial risk of death to [A.M.]" and "knowingly act[ed] in a manner likely to be injurious to [her] physical, mental, or moral welfare." To prove that Melvin committed Assault in the Third Degree the State had to show beyond a reasonable doubt that he "recklessly or intentionally cause[d] physical injury to [A.M.]." *See* Appellee's Ans. Br. App. App. at B8-9.

[42] Appellee's Ans. Br. App. at B59.

[43] D.R.E. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[44] "Materiality looks to the relation between the propositions for which the evidence is offered and the issues, or ultimate facts, in the case." *Getz*, 538 A.2d at 731 (citing C. MCCORMICK, EVIDENCE § 185, at 541 (Cleary 3d ed. 1984)).

[45] D.R.E. 404(b) establishes a non-exhaustive list of possible proper purposes, "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *See id*. at 730-31.

14

Melvin's cruel punishments.[46] Moreover, Melvin's uncharged acts of abuse were not too remote in time from the charged offenses. Each of the incidents admitted occurred within two years of the charged offenses, well within the ten-year "rule of thumb" established by this Court in *Allen v. State*.[47]

Finally, in weighing the probative value of the evidence against its prejudicial effect under the fifth prong of the *Getz* analysis, the Superior Court considered the factors identified by this Court in *Deshields* and concluded that the prejudice of admitting the bad acts did not substantially outweigh their probative value.[48] After a thorough review of the record, we find no error in the Superior Court's analysis or conclusion.

It is the burden of the State to "prove all the elements of a criminal offense beyond a reasonable doubt."[49] Where, as here, the defendant disputes the intent element of the crimes for which he is charged, evidence of the defendant's

---

[46] *See Johnson v. State*, 983 A.2d 904, 934 (Del. 2009) ("Eyewitness testimony is normally deemed sufficient to satisfy the plain, clear and convincing standard utilized for admission of other crimes evidence under Rule 404(b).").

[47] *See Allen v. State*, 644 A.2d 982, 988 (Del. 1994). Melvin's abuse of A.M. began when she was seven years old, in 2008. *See* Appellee's Ans. Br. App. at B20.

[48] As noted, Melvin contended that his conduct was not intended to be abusive; thus, whether Melvin acted with sufficient intent was disputed for purposes of the first factor, and of probative value for the third. For the second factor, the Superior Court noted that Melvin's conduct was adequately proven through eyewitness testimony, photographs, and videos. The court also determined that the evidence had "independent logical relevance," that the State needed to use the evidence to establish its case, and that the evidence was "similar to the charged offenses, but not so similar to close the jury's mind given the proper instruction," which was given at least four times. Appellee's Ans. Br. App. at B63. The court also found that the trial would not be "significantly longer to justify the exclusion of the evidence." Appellee's Ans. Br. App. at B64.

[49] *Estelle v. McGuire*, 502 U.S. 62, 69 (1991).

previous actions is highly relevant in proving that facet of the State's case.[50] For example, A.M. testified that Melvin waterboarded her as punishment for vomiting after he force-fed her.[51] This incident, similar to many of the others, goes directly to Melvin's intent with regard to the charged waterboarding offenses, in which he claims he was not punishing A.M. Moreover, the evidence that Melvin suggests was most prejudicial, a photograph of A.M. sticking her fingers up her nose at Melvin's instruction,[52] was particularly probative given Melvin's trial strategy of impugning A.M.'s credibility. The photographic and video evidence of Melvin's abuse corroborated A.M.'s account of Melvin's actions, and undermined his claim that A.M. was lying about the extent of the abuse.

The Superior Court performed a proper *Getz* analysis and correctly determined that the evidence of Melvin's uncharged abusive acts was admissible. The record also shows that the trial court instructed the jury multiple times to not consider the uncharged acts of abuse for an improper purpose. For these reasons, we find no error in the trial court's ruling.

---

[50] *See* NEW WIGMORE, EVIDENCE OF OTHER MISCONDUCT § 8.5.2 (2014) ("[T]he most common use of motive evidence, as proved by means of uncharged misconduct, is to demonstrate that a person acted with a mental state required by the substantive law.").
[51] Appellant's Op. Br. App. at A56-57.
[52] *See* Appellant's Rep. Br. at 8 (comparing what Melvin terms the "doomsday" evidence to "the atomic bomb on Hiroshima").

16

We do not reach the Superior Court's alternate holding under the "inextricably intertwined" doctrine. [53] The doctrine is only applicable if evidence of uncharged bad acts cannot be properly admitted under D.R.E. 404(b). [54] Here, the evidence was properly admitted after the trial court conducted a full 404(b) analysis. Accordingly, there is no need for this Court to examine the trial court's "inextricably intertwined" determination on appeal. [55]

## B. The Superior Court Did Not Err by Granting the Jury's Request to Re-watch the § 3507 Statements During Deliberations

Melvin's second claim on appeal is that the trial court erred by granting the jury's request to re-watch A.M.'s and M.M.'s CAC interviews, while at the same time refusing to provide the jury with a transcript of Pauline's in-court testimony. Melvin contends that the court's decision was erroneous on both evidentiary and constitutional grounds.

---

[53] The Superior Court stated that "[t]he evidence supports the notion that the charged acts were part and parcel of a punishment regime for [A.M.]'s major crimes as perceived by the defendant . . . . Without the evidence, there would be a chronological and conceptual void in the State's presentation of the case that will likely result in significant confusion." Appellee's Ans. Br. App. at B64-65.

[54] *Pope v. State*, 632 A.2d 73, 76 (Del. 1993). In *Pope*, this Court stated which circumstances permit invoking the inextricably intertwined doctrine:

> It is *only* if the evidence of uncharged misconduct offered by the State is not admissible pursuant to any of the exceptions set forth in D.R.E. 404(b), or for any other consistent purpose, that a trial judge may consider the admissibility of such evidence pursuant to the carefully circumscribed "inextricably intertwined" doctrine. That doctrine's applicability is limited to "inextricably intertwined" evidence of uncharged misconduct which, if excluded, would create a "chronological and conceptual void" in the State's presentation of its case to the jury that would likely result in significant confusion.

*Id.* (citations omitted).

[55] *See id.*; *see also Trump v. State*, 753 A.2d 963, 972 n.43 (Del. 2000).

17

A trial court's decision to replay out-of-court statements to a jury during deliberations is reviewed for abuse of discretion.[56] Alleged constitutional violations related to a court's evidentiary ruling are reviewed *de novo*.[57] Because Melvin failed to object to the trial court's refusal to provide the jury with a transcript of Pauline's testimony regarding the waterboarding of A.M. at the kitchen sink, we review that portion of his claim for plain error.[58]

1.  *The trial court did not abuse its discretion by permitting the jury to re-watch A.M.'s and M.M.'s CAC interviews during deliberations.*

Melvin argues that replaying the videos inappropriately bolstered the State's case by enabling the jury to place "undue emphasis" on A.M.'s statements,

---

[56] *Taylor v. State*, 65 A.3d 593, 600-01 (Del. 2013).

[57] *Capano v. State*, 781 A.2d 556, 607 (Del. 2001).

[58] *See Capano*, 781 A.2d at 586; *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986). Candor requires that we acknowledge that the application of the plain error standard here can be the subject of colorable argument. As we discuss, Melvin did not object when the prosecutor advised the jury that it should ask for the § 3507 statements during her closing argument. Melvin did clearly object to granting the jury's request for those statements, but then did not object when the judge did not also accede to the jury's request for the transcript of Pauline's trial testimony. Melvin did ask that the jury be given his own trial testimony and that of another witness at the same time it was given the § 3507 statements, testimony that the jury did not request. Because all of these issues are related, the determination of the standard of review as to any of them is necessarily complicated. But like trial counsel, trial judges must make many judgments during trial and are entitled to rely on the precise arguments that counsel make in the course of a trial. Even on appeal, Melvin's precise arguments have shifted and we therefore hew to applying the plain error standard in circumstances where Melvin did not make an objection below, while giving him credit when he did. As we indicate later, this was a course of events that may have fallen short of the ideal; nonetheless, Melvin has presented no arguments that convince us that he suffered any genuine risk of injustice as a result.

18

especially given the time between A.M.'s testimony and the replay (nine days), and the context of the videotaped interview.[59]

11 *Del. C.* § 3507 states, in pertinent part, that "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."[60] In *Flonnory v. State*, this Court recognized a trial judge's broad discretion in allowing a jury to rehear testimony in any form, but noted that "admitting a witness's out-of-court written or recorded § 3507 statement as a trial exhibit that goes into the jury room during jury deliberations should be the exception rather than the rule."[61] The purpose of this rule is to prevent the jury from giving undue weight to any particular statement.[62]

Thus, under ordinary circumstances, "the recording of a section 3507 statement played during trial should not be entered into evidence as a separate trial exhibit for the jury to rehear during deliberations."[63] But our decision in *Flonnory* also established that the trial court has "discretion to depart from this default rule

---

[59] Appellant's Op. Br. App. at A20 (citing *People v. Jefferson*, 2014 WL 2769104 (Colo. Ct. App. June 19, 2014), *cert. granted* 2014 WL 7331934 (Colo. Dec. 22, 2014)). Melvin's headings and "Question Presented" refer to the interview with M.M. as well as with A.M., but his argument focuses on A.M.'s statements only.

[60] 11 *Del. C.* § 3507(a).

[61] *Flonnory v. State*, 893 A.2d 507, 525 (Del. 2006).

[62] *Taylor v. State*, 65 A.3d 593, 600 (Del. 2013) (citing *Flonnory*, 893 A.2d at 526).

[63] *Id.* at 601.

when . . . the situation so warrants,"[64] and expressly recognized two exceptions: (1) when the parties agree to admit the recording as evidence or (2) when the jury requests to replay the statement during deliberations.[65] "The trial judge's broad discretion in these circumstances is coextensive with his discretion to allow or to refuse to allow the jury to rehear in-court trial testimony of any witness."[66]

In *Lewis v. State*, this Court found that the trial court abused its discretion by sending multiple video-recorded § 3507 statements into the jury room for unrestricted use during deliberations.[67] At trial, the parties did not agree to admit the recordings as evidence and the jury never requested that the recordings be replayed during deliberations.[68] Despite the absence of the two recognized exceptions, the trial court decided that the recordings should be given to the jury to "work through" as it deemed necessary.[69] We stated that "[p]ermitting the jury to 'work through the tapes' is exactly the type of overemphasizing this Court was concerned about in *Flonnory*."[70] We further emphasized that the trial judge should usually permit only a single replaying of a § 3507 statement.[71] We ultimately held

---

[64] *Flonnory*, 893 A.2d at 527.
[65] *Flonnory*, 893 A.2d at 526-27; *Lewis v. State*, 21 A.3d 8, 14 (Del. 2011) ("If the jury does ask to rehear one or more section 3507 statements, the trial judge must exercise discretion at that time in deciding whether to grant the request and under what conditions").
[66] *Flonnory*, 893 A.2d at 527.
[67] *Lewis*, 21 A.3d at 13-15.
[68] *Id.* at 12-14.
[69] *Id.* at 12.
[70] *Id.* at 14.
[71] *Lewis v. State*, 21 A.3d 8, 14 (Del. 2011).

that the trial judge erred because (1) neither recognized exception to the default rule was applicable and (2) the jury was allowed unlimited use of the § 3507 statements.[72]

Unlike *Lewis*, the present case falls within the second recognized exception to the default rule: the jury, albeit at the suggestion of the prosecution,[73] specifically requested to rehear A.M.'s and M.M.'s § 3507 statements. Moreover, the record shows that the trial court did not arbitrarily grant the jury's request, but rather made an informed decision after hearing argument from both parties. The trial court examined the helpfulness of the statements, and determined that the interviews were "something that would be appropriate for the jury to hear," given the "conflicts in the in-court testimony and the out-of-court testimony."[74]

Mindful of this Court's decision in *Lewis v. State*,[75] however, the Superior Court also ruled that there could be only one additional viewing, and, upon request from Melvin, that the viewing would take place in the courtroom.[76] This decision

---

[72] *Id.* ("Once the taped section 3507 statements are played during trial, they should not be available to the jury during their deliberations, absent a prior agreement between the parties or a request from the jury during its deliberations to rehear a section 3507 statement.").

[73] The jury's request to re-watch A.M.'s and M.M.'s out of court statements was made only after the prosecution advised the jury in its closing argument that if it wanted to re-watch the § 3507 statements during deliberations, it should ask the trial judge for them. As we discuss more fully later herein, this suggestion by the prosecution was ill-advised and is a practice that should not be repeated in the future. *See infra* pp. 26-28.

[74] Appellee's Ans. Br. App. at B198.

[75] 21 A.3d 8, 13-14 (Del. 2011) ("[I]n the absence of an agreement by both parties, statements should not be given to a jury for unlimited replaying during their deliberations in response to a request for a rehearing").

[76] Appellee's Ans. Br. App. at B199.

helped avoid overemphasizing the credence of the requested statements, and thus eluded the concern we set forth in *Flonnory*.[77] Also upon Melvin's request, the Superior Court repeated the jury instructions on child witnesses, general witness credibility, and § 3507 statements before playing the videos.[78] Because the trial court reached a careful, calculated decision, while taking sufficient steps to limit prejudice to Melvin, we find no abuse of discretion.

   2. *The trial court did not commit plain error by refusing to provide the jury with a transcript of Pauline's testimony.*

We also find that the trial court did not commit plain error in denying the jury's request for a transcript of Pauline's testimony regarding the waterboarding of A.M. at the kitchen sink. "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly

---

[77] *Flonnory v. State*, 893 A.2d 507, 526 (Del. 2006):

> [A]llowing the jury to have transcripts of trial testimony during their deliberations might result in the jury giving undue emphasis and credence to that portion of the testimony. That concern is equally applicable to written or recorded § 3507 statements that are admitted into evidence as separate exhibits after they have been heard in open court.

[78] Appellee's Ans. Br. App. at B201, B208-11.

22

deprive an accused of a substantial right, or which clearly show manifest injustice."[79]

In *Flonnory*, we discussed a trial court's broad discretion to refuse a jury's request to review transcripts of testimony during deliberations:

> [A]s a matter of practice, transcripts are not prepared absent a formal request in connection with post-trial proceedings. Therefore, the potential delay in the trial to enable the transcripts to be prepared often militates against giving the jury transcripts of in-court testimony for their consideration during deliberation. Accordingly, it will almost always be within the trial judge's discretion to deny a jury's request for a transcript of a witness's statement.[80]

Melvin did not object when the Superior Court concluded that it did not have and would not create transcripts of A.M.'s or Pauline's trial testimony. Nevertheless, Melvin now argues that the trial court erred by providing the jury with the requested videos of A.M. and M.M. without also allowing the jury to review a transcript of Pauline's testimony. But Melvin has failed to offer any persuasive argument that the trial court committed plain error by denying the jury's request for a transcript of Pauline's testimony.[81] It cannot be said that Melvin was deprived of a substantial right, or that the trial court's ruling caused manifest injustice. Thus, Melvin's claim that the trial court erred by failing to create a

---

[79] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (internal citations omitted).
[80] *Flonnory v. State*, 893 A.2d 507, 526 (Del. 2006) (quotation omitted).
[81] *Wainwright*, 504 A.2d at 1100.

23

transcript of Pauline's testimony so that it could be reviewed during deliberations is without merit.[82]

The concurrence states that a transcript of witness testimony can be prepared in a matter of hours. While that may be true in some cases, there are many cases in the Superior Court where the preparation of a transcript, or even the reading back of testimony to the jury, would significantly delay the trial. It is for this reason that we expressly recognized in *Flonnory* that denying a jury's request for a transcript of witness testimony is "almost always . . . within the trial judge's discretion."[83] This rule of law is equally applicable when, in addition to requesting a transcript of trial testimony, the jury requests and receives other evidence during deliberations that is readily available. Here, the § 3507 statements requested by the jury were immediately available for review, while a transcript of Pauline's testimony was not. The trial judge, acting within his discretion, denied the jury's request to review the unavailable transcript. "Even though other responses may have been viable options, such as, asking the jury if the reading back of a particular portion of the testimony would suffice, we will not substitute our judgment for that of the trial judge whose on-the-scene perspective provides a unique vantage point."[84]

---

[82] Melvin also requested that the trial court supply the jury with other transcripts favorable to Melvin, which it did not request. Since the jury did not request such items, it was proper for the trial court to deny Melvin's request. *See Flonnory*, 893 A.2d at 526-27.

[83] *Id.* at 526.

[84] *Harrigan v. State*, 1997 WL 45084, at *2 (Del. Jan. 29, 1997).

*3. The trial court did not violate Melvin's constitutional rights under the Sixth and Fourteenth Amendments.*

Finally, Melvin claims that replaying the videos violated his constitutional rights under the Sixth and Fourteenth Amendments. He asserts that his inability to cross-examine A.M. again after the jury re-watched the CAC interview violated his Sixth Amendment right to confront her and his due process right "to have available contemporaneous cross-examination."[85] We find these claims to be unpersuasive.

The Sixth Amendment of the United States Constitution[86] and Article I, § 7[87] of the Delaware Constitution provide that criminal defendants have the right to confront adverse witnesses.[88] The Sixth Amendment Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."[89] This Court has stated that, "[t]he Confrontation Clause only guarantees a defendant the opportunity for effective cross-examination of the declarant, not effective cross-examination in whatever way and in whatever manner a defendant may wish."[90] "Thus, when a

---

[85] Appellant's Op. Br. at 28.

[86] U.S. Const. amend. VI.

[87] Del. Const. art. I, § 7.

[88] *Feleke v. State*, 620 A.2d 222, 227-28 (Del. 1993).

[89] U.S. Const. amend. VI.

[90] *Johnson v. State*, 878 A.2d 422, 428 (Del. 2005); *see also California v. Green*, 399 U.S. 149, 174 (1970) (Harlan, J., concurring) ("[T]he Confrontation Clause of the Sixth Amendment reaches no farther than to require the prosecution to produce and [make] available [a] witness whose declarations it seeks to use in a criminal trial.").

witness takes the stand at trial, and is subject to cross-examination, the traditional protections afforded under the Confrontation Clause are satisfied."[91]

In this case, Melvin concedes that he was afforded an opportunity to cross-examine both A.M. and M.M. extensively during trial and "probe and expose any infirmities" in both their in court and out-of-court testimony.[92] Based on Melvin's own description of his cross-examination of A.M.,[93] it appears that he is satisfied with the results he obtained. Even if he were dissatisfied, that does not amount to a constitutional violation. The defense was given a full and fair opportunity to cross-examine both A.M. and M.M. Accordingly, no Confrontation Clause violation occurred.

Melvin's due process claim is similarly unavailing. It is true that "the right of confrontation and cross-examination is an essential and fundamental requirement for [a] fair trial."[94] Melvin cites precedent from other jurisdictions in support of his claim that replaying § 3507 statements without allowing for additional cross-examination violates due process. This argument, however, runs

---

[91] *Johnson*, 878 A.2d at 428-29; *see also Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985).

[92] *Feleke*, 620 A.2d at 225, 228.

[93] Melvin points out in his reply brief that not only did he have an opportunity to cross-examine A.M., but "[A.M.] [] was mightily impeached in her cross-examination." Appellant's Rep. Br. at 13.

[94] *Lee v. Illinois*, 476 U.S. 530, 540 (1986) (quoting *Pointer v. Texas*, 380 U.S. 400, 405 (1965)); *see also California v. Green*, 399 U.S. 149, 186 n.20 (1970) (Harlan, J., concurring).

counter to established precedent.[95] Due process guarantees a fair trial, which includes *an opportunity* (not multiple opportunities) to cross-examine an adverse witness in a manner that allows the trier of fact to draw inferences relating to the witness's reliability.[96] That is exactly what Melvin was provided in this case. A.M. and M.M. were subject to cross-examination by Melvin, and Melvin used that opportunity to question them about their statements in the CAC interviews. Melvin thus had a full and fair opportunity to cross-examine the witnesses, which is sufficient for purposes of the Sixth and Fourteenth Amendments.[97]

## C. The State's Ill-Advised Suggestion That the Jury Ask the Court to Re-watch the § 3507 Statements Is a Practice That Should Be Avoided

The last issue we address on appeal concerns a remark made by the State during closing arguments regarding A.M.'s and M.M.'s § 3507 statements. In its closing argument, the State told the jury that it was generally not permitted to rehear A.M.'s and M.M.'s recorded statements during deliberations. The State then went on to say, "[h]owever, if at some point during your deliberations you feel you would like to take another look at any of those recorded interviews, just notify the bailiff and make a request and the Court will consider it."[98]

---

[95] *See Delaware v. Fensterer*, 474 U.S. 15, 18-22 (1985); *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970); *Green*, 399 U.S. at 186 n.20 (Harlan, J., concurring).
[96] *See Goldberg*, 397 U.S. at 268-69; *Green*, 399 U.S. at 186 n.20 (Harlan, J., concurring); *Mattern v. Mathews*, 582 F.2d 248, 259 (3d Cir. 1978).
[97] *See Feleke v. State*, 620 A.2d 222, 228 (Del. 1993) (quoting *Fensterer*, 474 U.S. at 22).
[98] Appellee's Sur-Rep. Br. at 1.

At oral argument before this Court, Melvin for the first time contended that the State's remark informing the jury that it should ask for the § 3507 statements if it wanted to review them during deliberations was improper.[99] Although this argument was not properly raised on appeal,[100] we recognized the importance of the issue and permitted the parties to submit supplemental briefing to determine whether an objection to the State's remark had been fairly raised below and,[101] if not, whether the trial court's failure to act constituted plain error. After thoroughly reviewing the record and the additional briefing submitted by both parties, we find that Melvin failed to timely object to the State's remark at trial.[102] We also find Melvin's argument that the trial court committed plain error by not *sua sponte* intervening when the prosecution made the suggestion to the jury to be unavailing.[103]

---

[99] Melvin failed to raise a claim challenging this remark in his opening brief on appeal.

[100] *See* Supr. Ct. R. 14(b)(vi); *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal.") (citations omitted).

[101] *See* Supr. Ct. R. 8.

[102] Melvin did make a passing comment well after closing arguments speculating as to what caused the jury to submit its request to the trial judge: "[The jury submitted its request] [b]y virtue of the prosecutor overstepping bounds, I suggest." Appellee's Ans. Br. App. at B197. We do not find that this remark constitutes a proper, timely objection. D.R.E. 103(a)(1).

[103] In *Baker v. State*, this Court set forth the law governing claims of prosecutorial misconduct under a plain error standard of review:

> The first step in the plain error review of prosecutorial misconduct mirrors that in the review for harmless error: we examine the record *de novo* to determine whether prosecutorial misconduct occurred. If we determine that no misconduct occurred, our analysis ends. If, however, the trial prosecutor did engage in misconduct we move to the second step in the plain error analysis by applying the familiar *Wainwright* standard. Under that standard, "the error complained of must be so clearly

28

We do, however, take this opportunity to advise attorneys to avoid this practice in the future. A jury's request to rehear a § 3507 statement during deliberations is an exception to the general rule, and applies when the jury requests to rehear a § 3507 statement of its own accord. This exception was created with the understanding that the request would be spontaneous in nature, not made at the encouragement of counsel. As the State admitted at oral argument before this Court, this action is not "best practice,"[104] and it should not be repeated in the future. Attorneys should not direct the jury to make requests to the trial judge to review testimonial evidence that is otherwise not permitted during deliberations.

## III.   CONCLUSION

The judgment of the Superior Court is **AFFIRMED**.

**STRINE**, Chief Justice, concurring:

I concur in the well-crafted opinion of the Majority, and write separately only to note that when a trial judge partially grants a jury's request to be shown part of the evidence again, and refuses to provide another related part the jury also asks to review, the reason for denying the related request cannot rationally be

prejudicial to substantial rights as to jeopardize the fairness and integrity of the *trial* process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."
906 A.2d 139, 150 (Del. 2006) (quoting *Wainwright*, 504 A.2d at 1100).
[104] Oral Argument at 34:30, *Morse v. State*, No. 200, 2014 (May 6, 2015) (referring to the prosecutor's advising the jury to request the § 3507 statements as "not a best practice.").

29

premised on the fact that the other part consists of trial testimony not yet fully transcribed. In other words, the justification should be something more substantial than the fact that the testimony is unavailable only in the sense that it is has not been reduced to a final transcript.

I recognize and agree with the rule set forth in *Flonnory v. State* that expedited transcripts need not be prepared to show to the jury during deliberations.[105] But that is because the general rule is that juries do not examine any of the trial evidence again during their deliberations, but deliberate based on what they absorbed of the evidence as it was presented live at trial. Expedited transcripts can and often are prepared in many of our courts, and transcripts of a particular witness's testimony can be prepared in a matter of hours by our skillful court reporters. In fact, it would even be possible for a court reporter to read back the testimony to the jury.

When a trial court accedes to a jury's request to see a witness's videotaped § 3507 statement, it should not be unexpected that the jury might also wish to compare that statement to the witness's trial testimony or another trial witness's testimony, as was the case here. Once a trial judge goes down the route of permitting the jury to see particular parts of the record again at the jury's request, it is hazardous to deny them the chance to view other logically related parts of the

---

[105] 893 A.2d 507 (Del. 2006).

30

record and the court should consider carefully whether selectively granting requests for a second viewing of evidence would put undue weight on parts of the record and compromise the jury's ability to put all the evidence in fair perspective. After all, a primary concern of *Flonnory* is the worry that permitting the jury to dilate on specific aspects of the record will lead them to place too much emphasis on those parts, and thus too little emphasis on the rest of the much larger record.[106] And if despite these dangers of imbalance, the trial court does decide to grant a jury request to see parts of the record again, any concern about the burden to court reporters in preparing expedited transcripts of related parts of the record must go out the window, with the sole focus on what is necessary to ensure a fair trial.

But I agree with the Majority that the plain error standard requires that Melvin show that the selective granting of the jury's requests resulted in manifest injustice to him. That is an onerous burden that he has not met.

---

[106] *Id.* at 525.