IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KYAIR KEYS, | § | |
| | § | No. 368, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID Nos: 2205008790 A/B |
| STATE OF DELAWARE, | § | 2201008460; 2201008498A(N) |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: September 17, 2025
Decided: December 9, 2025

Before **TRAYNOR**, **LEGROW,** and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Molly R. Dugan, Esquire, EUGENE J. MAURER, JR., P.A., Wilmington, Delaware, *for Appellant Kyair Keys*.

Jordan A. Braunsberg, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

In the wake of numerous shooting incidents in Wilmington, Kyair Keys was charged in a multiple-count indictment with, among other things, attempted murder, two counts of assault in the first degree, and numerous firearm offenses. According to the indictment, the offenses were committed between January 14 and January 22, 2022.

At Keys's trial, the Superior Court allowed the prosecution—over Keys's objection—to play an Instagram video showing Keys in a vehicle that had been stolen on January 22. Keys had objected to the admission of the audio portion of the recording from which could be heard a recorded rap song that, according to the prosecution, chronicled Keys's willingness to shoot unarmed individuals. The Superior Court viewed the question of the audio recording's admissibility as implicating Delaware Rule of Evidence 404(b), which circumscribes the admissibility of evidence of a person's involvement in other uncharged wrongful conduct. After conducting the type of analysis required by our case law when evidence is offered under Rule 404(b), the court overruled Keys's objection and the jury was permitted to hear the audio recording and the police officers' interpretation of it.

The jury ultimately found Keys guilty of attempted murder, both assault charges, and most of the other offenses on which he stood trial. After the court

2

sentenced Keys to 47 years of Level V incarceration, followed by probation, he filed this appeal.

On appeal, Keys advances a single claim: he contends that the admission of the audio recording constituted an abuse of the trial court's discretion and was so prejudicial as to warrant reversal of his convictions. In response, the State argues that admission of the challenged audio recording was well within the trial court's discretion but that, even if it wasn't, any error was harmless and should not result in reversal.

Although we question the Superior Court's decision to view this evidentiary issue through the lens of D.R.E. 404(b) and believe that the better course would have been to exclude the evidence, we agree with the State that any error was harmless. Consequently, we affirm the Superior Court's judgment of conviction.

I

A

Weeks after ringing in the new year, Wilmington police officers found themselves deep in an investigation into a series of shootings. On January 14, 2022, Officer Shauntae Hunt responded to a "shots fired" notification received through the police department's ShotSpotter alert system. He arrived at the scene—a daycare center—where he saw "a lot of shell casings in the street" and the shattered rear

3

windows of the daycare center.[1] A review of the surrounding surveillance camera footage showed three people arriving in, then exiting from a Hyundai. The three individuals spread out into the street, shooting their firearms in the direction of two other individuals walking on the nearby sidewalk. The middle shooter wore clothes—black pants, a black hooded sweatshirt, and black shoes—that were similar to those eventually obtained from Keys. That suspect was carrying a firearm with a silver slide.

On January 20, 2022, another shooting occurred. Two Wilmington police officers were patrolling around Lombard Street when they heard "approximately 20 gunshots."[2] The officers gave chase to a fleeing Kia Optima containing four suspects. The pursuit ended when the driver of the Optima lost control and the suspects ditched the vehicle. Only one suspect was taken into custody, Jahmir Morris-Whitt. Keys was not charged with this incident.

A third shooting occurred two days later. A few hours after midnight, on January 22, 2022, Officer Markees Gordon responded to a "shots fired" notification at a BP gas station. Upon arrival, Officer Gordon found shell casings scattered around the area. A surveillance camera captured the incident. The video footage depicted a Kia Soul speeding away from the gas station as an individual chased on

_____

[1] App. to Opening Br. at A219.
[2] *Id.* at A339.

4

foot, pointing a handgun at the rear of the car. A gray Mazda was parked ahead, standing in the way of the Kia's escape route. The driver of the Mazda attempted to exit from the vehicle when the Kia sideswiped the door, shattering the driver's-side window.

The driver and a passenger slipped out of the Mazda with their firearms trained on the fleeing Kia. Four muzzle flashes—signaling four bullets fired—burst from the firearm held by the driver. Seven additional flashes escaped the barrel of the passenger's firearm.

According to the detective who reviewed the camera footage, the driver wore distinctive clothing—gray pants with white stripes running down each pant leg, a white shirt underneath a black hooded sweatshirt, and black shoes—which later tied Keys to this shooting.

In Philadelphia, several hours after the BP shooting, a Walmart parking lot security camera captured a gray Mazda rear-ending a parked white Dodge Charger. The owner of the Charger, who was asleep in the car, was awakened by the impact. When the owner alighted from his vehicle, it was stolen by the occupants of the Mazda. The parking lot video showed the Charger's owner running from the car as it sped away from the lot. The gray Mazda was left behind.

While on patrol later that morning, Corporal Daniel Shea received a notification on his police-operated Instagram account that Keys was streaming a live

feed.  He recorded the feed on his phone.  The video depicted Keys driving around in the stolen Charger while listening to a song called "F*** Ya Dead Patnaz."[3] Corporal Shea recorded and saved the video for his records.

Around 4:00 p.m., a surveillance camera in Wilmington spotted a white Charger driving around 7th Street.  Footage showed a masked individual exiting from the Charger and approaching a deli.  The individual—who was wearing a black sweatshirt, black pants, and black shoes—carried a firearm in the left hand.  The person entered the deli and shortly returned to the car.  Minutes later, a different camera caught the Charger rolling down the street with a person leaning out of the passenger-side of the vehicle, shooting a firearm as passersby sought cover.  An officer testified at trial that he could see puffs of smoke escaping from the passenger-side window, indicating "a firearm being discharged."[4]

Around 9:30 p.m., Officer Scott Gula spotted a white Charger.  He suspected that it was the vehicle reported stolen from Walmart and ran the license plate number. The plates matched.  Officer Gula called for back-up and activated his lights and sirens to pull the vehicle over.  The Charger fled with the officer in pursuit.  The chase ended when Officer Gula used his patrol car to pin the Charger against a guardrail.  The driver bailed and ran into the woods while officers arrested the other

---

[3] App. to Opening Br. at A735; Opening Br. Ex. C at 1; State's Trial Ex. 353 (Instagram video).
[4] App. to Opening Br. at A819.

occupants. Not long after, officers found Keys hiding "underneath . . . a couple of logs" and took him into custody.[5] Officers escorted Keys to the squad cars where he could be seen wearing clothes—a black sweatshirt with a white undershirt on top of gray pants with white stripes—that matched those worn by the suspect of the earlier shootings. Police also recovered a pair of Keys's black pants in the woods.

A search of the Charger revealed two firearms: a black 9-millimeter Polymer80 that was laid behind the driver's seat and a .40 caliber Smith & Wesson handgun with a silver slide that was located in the front center console. Ballistic testing confirmed that both firearms were used in the earlier shootings.

B

Keys was named in 24 counts of a 44-count indictment for his involvement in the January 14 and January 22 shootings and the ensuing chase on January 22. Jahmir Morris-Whitt was named as Keys's codefendant and coconspirator in the January 14 shootings. Markel Richards and Walike Parham were named as Keys's codefendants and coconspirators in the January 22 incident. The Superior Court severed the possession-of-a-firearm-by-person-prohibited ("PFBPP") counts to be adjudicated in a bench trial held simultaneously with Keys's jury trial on the remaining charges.

---

[5] *Id.* at A909–10.

Two weeks before Keys's trial was scheduled to begin, the State notified the Superior Court that it intended to introduce a "'live' video on the known Instagram account of Defendant Kyair Keys."[6] This Instagram post forms the crux of this appeal.

According to the State's letter to the court,

> [t]he Instagram video shows Keys driving what the State will argue is the stolen white Dodge Charger taken during the carjacking in Philadelphia approximately six hours prior. During the Instagram video, Keys and his co-occupants of the car are listening to a rap song that is well-known by the Chief Investigating Officer in this matter – Det. Wham. The rap song is about violence in the city of Wilmington. It includes lyrics such as "get out the car, hit a switch and light them up," "partners will end up in a ditch," and "chase a n**** down," while gunshots are heard in background of the rap song.[7]

By letter submitted the following day, Keys, through counsel, registered his objection to admission of the video. Aside from certain foundational objections not relevant to this appeal, Keys argued that "the music in the background of the video is irrelevant to the submitted purpose of its admission and highly prejudicial to the defendant."[8] He contended further that

> the defendants did not participate in the creation of the song and the song does not appear to mention or otherwise be connected to the defendants. Therefore, this song is not relevant as required by D.R.E.

---

[6] Opening Br. Ex. B at 1.
[7] *Id.*
[8] Opening Br. Ex. C at 1.

401. Any probative value the video and the rap song therein contain[s] is far outweighed by the danger of unfair prejudice.[9]

The court heard from counsel on this issue during a pretrial teleconference. Initially, the court perceived that the State's introduction of the Instagram video was intended to show that Keys was involved in a carjacking incident—that is, uncharged conduct implicating D.R.E. 404(b)'s other-bad acts restrictions. Indeed, in an earlier motion in limine, the State sought leave to introduce the video and other evidence to show, among other things, that Keys was involved in the Philadelphia carjacking. But the prosecutor soon clarified that there would be no reference to carjacking and that the evidence would merely show that the white Dodge Charger was "taken from Philadelphia . . . and that [the] Mazda . . . that was previously used in other incidents for which Kyair Keys is charged" was left behind.[10] This concession appears to have satisfied Keys's counsel and eliminated the Rule 404(b) issue, but it left, in the court's words, "one remaining evidentiary issue, which was the sing-along that was going [on] with the rap song."[11] Put another way, the evidentiary dispute had been narrowed; the video portion of the Instagram post would be admitted with Keys maintaining his objection to the jury hearing the audio portion. The State, however, insisted that the audio portion was relevant.

---

[9] *Id.* at 2.
[10] App. to Opening Br. at A77.
[11] *Id.* at A79.

The State explained that, during the late morning hours on the day the Dodge Charger was stolen in Philadelphia, a Wilmington police officer received "a notification that Kyair Keys was going live on Instagram."[12] The officer "clicked on [the] notification and screen recorded what was happening on Instagram."[13] Kyair Keys was driving the Charger while a rap song played in the background. The prosecutor then recounted the lyrics of interest and their hidden meaning and explained why they were relevant to the prosecution:

> [T]here are a number of words mentioned, including a rhyme that has the defendant's name in it specifically. So that lyric says that "Puffy in the back, so please don't lack. He light that draco up." Puffy is Kyair Keys' nickname on the street. His name is saved that way in multiple individual phones, including codefendant's in this case.

> That lyric specifically means that Kyair Keys is standing by and don't get caught without your gun around Puffy. Because if he catches you, he's going to fire his draco, which is a slang term for gun. These lyrics, including ones of "chase the N word down," while hearing gunshots in the background, "get out of that car," "hit a switch and wipe them up," meaning firing the gun at people, and that your partners will end up in a ditch in that they are highly relevant for this case even though Kyair Keys did not create the song.

> So this involved him and is evidence of motive and identity because he is charged with several shooting incidents, some before the Instagram video, some after the Instagram video. In all of those shootings stolen cars are used by Keys to chase other people down and shoot them. And that will be evident from surveillance videos played during this trial.

---

[12] *Id*. at A80.
[13] *Id*.

So the fact that he is listening to those songs about chasing people down while gunshots are heard in the background of a song and getting out of the car and lighting people up goes to motive and identity of Keys as one of the people involved in this week-long series of incidents, because those are exactly the actions that Kyair Keys takes.[14]

The Superior Court deferred its decision on the issue for trial, noting, among other things, that the State needed to establish a connection between Puffy and Keys to admit the video.

C

An eight-day trial ensued. Apart from the challenged Instagram audio evidence, the State introduced four types of evidence to link Keys to the shootings: (1) surveillance video; (2) ballistics; (3) cell phone location data; and (4) cell phone communication data.

When the police apprehended Keys on January 22, he was wearing gray sweatpants and a black hooded sweatshirt. His black pants, which were not on his person at the time, were recovered nearby. The middle shooter depicted on the surveillance video from the January 14 daycare shooting appeared to be dressed in similar fashion. The shooter was heavy set; so is Keys. The surveillance video showed that the middle shooter's firearm had a silver slide; so did one of the guns found in the Charger that Keys was driving immediately before his apprehension.

---

[14] *Id.* at A81–82.

In like manner, the surveillance video capturing aspects of the January 22 shootings at the BP station and on 7th Street depicted a shooter whose clothing and physical characteristics corresponded with that of Keys's. For instance, the driver of the Mazda in the BP surveillance video was wearing clothing that matched what Keys was wearing when arrested. And the business surveillance video that showed events that occurred in the vicinity of the 7th Street shooting showed a person carrying a gun with a silver slide in his left hand. Keys is left-handed.

Ballistics evidence showed that the .40 caliber Smith & Wesson firearm that was found in the Charger's front center console following the January 22 chase and Keys's arrest was used in the January 14 daycare shooting. It also showed that the 9-millimeter Polymer80 found on the Charger's floorboard was used in the BP shooting.

Cell phone location evidence, introduced through an FBI special agent assigned to the "Cellular Analysis Survey Team,"[15] placed Keys at the BP station at the time of that shooting. It also showed Keys's device moving in a southerly direction after the shooting, which was consistent with the chase that ensued. The agent's testimony also established that Keys's phone was in Philadelphia at the time

_____

[15] FBI Special Agent Garrett Swick described the "CAST" team as "a group of about 80 special agents who have gone through specialized training where [they] use historical cell phone records to place devices at specific places or general areas at specific points in time." *Id.* at A1206.

12

of the Charger theft and was in the vicinity of 7th Street in Wilmington around the time of the shooting there.

The evidence of cell phone communications—phone calls and text messages—between Keys and his coconspirators was less definitive. But it did show that Keys, Parham, Richards, and Morris-Whitt were in frequent touch with each other at or around the time of the shootings.

D

Around the midpoint of Keys's trial, the court revisited the admissibility of the Instagram post, which showed Keys in the stolen Charger. The court's ruling was preceded by the voir dire examination of two police witnesses. One confirmed that Keys's nickname was "Puff" or "Puffy," while the other—Detective Brendan Wham—interpreted the lyrics of the rap song that could be heard on the recording. Detective Wham believed that the song was published and sung by a rapper named Chaz Cowan in 2019. The detective knew of no connection between Cowan and Keys.

The excerpt of particular interest to the prosecution was: "Puff in the back, don't lack, he'll let that draco up."[16] Without objection, the detective opined as to

---

[16] App. to Opening Br. at A736. We note that the prosecutor's rendition of the lyrics at the pretrial conference discussed earlier was slightly different and included the phrasing "*light* that draco up" instead of "*let* that draco up."

the meaning of these cryptic phrases: "[S]aying 'Puff is in the back' . . . mean[s] 'he's part of our team'; 'don't lack' means 'don't let us catch you . . . without your firearm'; and then the line about a 'draco,' a 'draco' is in fact a firearm."[17]

Against this limited background, the trial court asked the State to explain the basis for admitting the audio portion of the post. At first, the State contended that D.R.E. 404(b) had no bearing on the issue because the evidence was "not talking about any prior bad acts of Mr. Keys or any general character disposition of hi[s]."[18] As to the reference to the "draco," the State argued, albeit obtusely, that "the song is about violence in the city of Wilmington . . . [and] [t]hat is evidence of motive in this case."[19] The prosecutor also argued that the song lyrics tend to "establish identity . . . [and] that [Keys] is doing exactly what is being sung about him in [the] song."[20] In a telling exchange that clashed with the State's contention that D.R.E. 404(b) was inapplicable, the court asked whether the song "talks about [Keys's] propensity to do something[,]" and the prosecutor responded: "I guess potential propensity."[21] The court followed up: "Isn't that character evidence or propensity evidence?"[22] The prosecutor admitted that she struggled with that question and

---

[17] *Id.* at A737 (single quotation marks added).
[18] *Id.* at A741.
[19] *Id.* at A739.
[20] *Id.* at A741.
[21] *Id.* at A742.
[22] *Id.* at A743.

14

reiterated that a properly instructed jury could use the evidence "just to evaluate identity and motive."[23] Because proof of identity and motive are purposes for which other misconduct evidence can be used under D.R.E. 404(b), the discussion of the factors the court traditionally consults when considering the admissibility of evidence under that rule.

Defense counsel agreed that the admissibility of the audio "should be analyzed not only as [to] relevance but [also] under [D.R.E.] 404(b)."[24] Counsel noted, however, that the song lyrics did not refer to any "prior bad act." Even so, counsel grounded her objection in D.R.E. 404(b)'s prohibition against the use of uncharged propensity evidence. Counsel understood that, at bottom, the State was using the evidence to show that Keys was "known in the community to shoot [unarmed] people."[25]

The trial court agreed with Keys that his objection should be considered under D.R.E. 404(b). Because the rap song referred to shooting—at least, "inferentially"[26]—the court saw it as referring to "a prior bad act."[27] The court noted that the evidence "refers to something that the defendant would do presumably based on something he has done," and that "would be prohibited by [D.R.E.] 404(b)

---

[23] *Id.*
[24] *Id.* at A750.
[25] *Id.* at A751.
[26] *Id.* at A761.
[27] *Id.*

15

because it is propensity evidence."[28]   The court then considered whether the evidence would be offered for a permissible purpose under D.R.E. 404(b)(2).  It rejected the State's contention that the evidence proved that Keys had a motive to engage in the charged shootings.  The court focused instead on the State's contention that the evidence tended to prove that one of the shooters in the charged incidents was Keys, that is, that it was offered to prove identity, one of the permitted uses under D.R.E. 404(b)(2).  The court concluded that, by calling attention to the rap song, Keys was in effect bragging that he was inclined to shoot unarmed persons, and it was therefore more likely than not that he was a shooter in the charged incidents.

Recognizing that a proponent of uncharged misconduct evidence must produce plain, clear, and conclusive evidence of the prior misconduct,[29] the trial court assessed the rap-song lyrics with that in mind.  The court observed that the song lyrics did not refer "to any particular incident" and that there was "really no evidence that [Keys] did any of these other things except by reference in a song"[30] sung by someone other than Keys.  Even so, the court found the evidence to be plain, clear, and conclusive that Keys had engaged in "crimes, wrongs, or other acts" that

---

[28] *Id.*

[29] D.R.E. 404(b) addresses misconduct (crimes, wrongs, or other acts) without regard to whether the misconduct occurred before or after the charged crimes.  Here, as in most cases, the misconduct occurred before the charged crimes were alleged to have been committed.

[30] App. to Opening Br. at A764.

16

shed light on the identity of the shooters in the charged incidents because Keys's

playing of the song was "in a sense a confession."[31]  Hence, after reviewing other

factors relevant to whether prior misconduct evidence may be admitted under Rule

404(b), the court overruled Keys's objection, and the jury was permitted to hear the

audio portion of the Instagram post.

Before the jury reviewed the video and heard the audio portion of the post, the

trial judge gave the following instruction:

> Ladies and gentlemen, what you're about to hear and see is a recording, and it is evidence of certain other actions or possible crimes allegedly committed by Kyair Keys involving shooting a firearm, which is described in this recording.  Defendant Keys is not charged with any bad acts or crimes in connection with that song . . . . You may not consider this evidence that's about to be played of those things mentioned in the song for the purpose of concluding that Defendant Keys is of certain character or character trait and was acting in conformity with that character or character trait with respect to the crimes charged in this case.  You may not use this evidence to conclude that Defendant keys is a bad person or has a tendency to commit criminal acts and is therefore probably guilty of the crimes charged here.  You may use this evidence related to those actions described in the video only to determine issues relevant to the charged crimes.  In this case the State contends that the evidence of those actions described in this song relate to Defendant Keys' identity and his plan to commit the crimes charged in this case.  You may consider such evidence of those acts only for those purposes.  Further, as with any other evidence in the case, you, the jurors, are the sole finders of fact, and you must decide what, if any, weight to give to that evidence.[32]

---

[31] *Id.* at A767.

[32] *Id.* at A777–78.  We have omitted two sentences in which the court informed the jury that the evidence was not being offered against the codefendant Parham and should not be considered when the jury "decide[d] the charges" against him.

17

After the jury listened to the Instagram post, the detective's translation of the lyrics was slightly, but not materially, different than the translation offered to the court outside the jury's presence. He confirmed that "Puff in the back" signified that Keys was "on our side."[33] The detective expanded on his interpretation of "don't lack," which he now translated as "if we come in contact with you, you better not be without [a] weapon."[34] The detective then repeated that "draco" refers to "a type of firearm."[35] And at the close of the case, the court instructed the jury once again to not consider the song in the video for any other purpose.

The jury found Keys guilty of all charges submitted to them. In the simultaneous bench trial, the court found Keys guilty of four of the five PFBPP charges. The judge, however, found Keys not guilty of one count of possession of a firearm by a person prohibited.[36] Keys was sentenced to 47 years of Level V incarceration followed by decreasing levels of probation.

In this appeal, Keys contends that the trial court abused its discretion in allowing the jury to hear the audio portion of the Instagram post. This error, according to Keys, deprived him of his right to a fair trial and warrants reversal and a remand for a new trial. The State counters that the trial court properly admitted

---

[33] *Id.* at A808.
[34] *Id.* at A809.
[35] *Id.* at A812.
[36] *Id.* at A1588 ("As to Count 37 . . . . I find Mr. Keys not guilty of that charge. I believe the person in the back seat possessed or controlled that weapon.").

18

the challenged evidence under Rule 404(b) and our relevant precedents but that, even if the evidence was erroneously admitted, the error was harmless.

II

"We review for abuse of discretion a trial judge's admission of evidence under D.R.E. 404(b)."[37]  "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice [] as to produce injustice."[38]  In the event that evidence is erroneously admitted, we apply the harmless error standard, which we describe more fully below.

III

A

We conduct our review of the trial court's admission of the challenged evidence under Rule 404(b) against the backdrop of other, more general rules of evidence.  "Evidence must be relevant to be admissible at trial."[39]  Under D.R.E. 401, "[e]vidence is relevant if: . . .[i]t has any tendency to make a fact more or less probable than it would be without the evidence; and [t]he fact is of consequence in determining the action."  But even relevant evidence may be excluded under some circumstances.  Specifically, under D.R.E. 403, "[t]he court may exclude relevant

---

[37] *Morse v. State*, 120 A.3d 1, 8 (Del. 2015) (citation omitted).
[38] *McGuiness v. State*, 312 A.3d 1156, 1190 (Del. 2024) (alteration in the original) (quoting *Chaverri v. Dole Food Co.*, 245 A.3d 927, 935 (Del. 2021)).
[39] *Stickel v. State*, 975 A.2d 780, 782 (Del. 2009) (citing D.R.E. 402).

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

With these principles in mind we turn to D.R.E. 404(b)'s treatment of evidence that a person has committed what are frequently—and not necessarily accurately—referred to as "prior bad acts."[40] In particular, Rule 404(b)(1) prohibits the use of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Under Rule 404(b)(2), however, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Thus, under the first sentence of Rule 404(b), evidence of misconduct to show a defendant's disposition or propensity to commit certain crimes is not allowed. But under the second sentence prior-misconduct evidence "is admissible when it has 'independent logical relevance' and when its probative value is not substantially outweighed by the danger of unfair prejudice."[41]

---

[40] Rule 404(b) applies with equal force when the evidence of a crime, wrong, or other act was committed subsequent to the conduct under consideration by the trier of fact.

[41] *Getz v. State*, 538 A.2d 726, 730 (Del. 1988) (citations omitted).

When considering the application of Rule 404(b), our trial courts follow the guidance this Court provided in *Getz v. State*,[42] and *DeShields v. State*.[43] Under *Getz*, there are six prerequisites to the admission of prior bad acts:

(1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

(2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.

(3) The other crimes must be proved by evidence which is plain, clear and conclusive.

(4) The other crimes must not be too remote in time from the charged offense.

(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.

(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.[44]

In *DeShields*, the Court listed a host of factors for trial courts to consider when balancing the probative value of the challenged evidence against its unfairly prejudicial effect under the fifth *Getz* factor:

(1) the extent to which the point to be proved is disputed;
(2) the adequacy of proof of the prior conduct;

---

[42] *Id*. at 734.
[43] 706 A.2d 502, 506–07 (Del. 1998).
[44] *Getz*, 538 A.2d at 734 (internal quotation marks omitted) (footnote omitted) (citations omitted).

(3) the probative force of the evidence;

(4) the proponent's need for the evidence;

(5) the availability of less prejudicial proof;

(6) the inflammatory or prejudicial effect of the evidence;

(7) the similarity of the prior wrong to the charged offense;

(8) the effectiveness of limiting instructions; and

(9) the extent to which prior act evidence would prolong the proceedings.[45]

B

Keys contends that the trial court's decision to admit the audio portion of the Instagram post does not pass muster under *Getz* and *DeShields*. His argument assumes, consistently with his argument at trial, that Rule 404(b) is the proper lens through which to view the evidence. As a threshold matter, we question this premise. As we understand the contested audio evidence, the song lyrics—even as they are translated by Detective Wham—do not attribute any "crime, wrong, or other act" other than the possession of a firearm to Keys. At best, the lyrics suggest that Keys was "on our side," whatever that might mean, and warn listeners to be on guard against some unspecified risk of harm. The prosecutor herself, who characterized the evidence as a "song about violence in the city of Wilmington,"[46] acknowledged that "there[] [was] no prior bad act here."[47] She continued with the admission "that

[45] *DeShields*, 706 A.2d at 506–07 (quoting Graham C. Lilly, *An Introduction to the Law of Evidence*, § 5.15 at 177–78 (3d ed. 1996) (citing C. Mueller & L. Kirkpatrick, *Federal Evidence* § 4.21, at 268–71 (1995)).

[46] App. to Opening Br. at A739.

[47] *Id*. at A745.

there's no evidence that he has done this before in this particular case, which is what that *Getz* factor [that is, the requirement that the prior bad act be proved by plain, clear, and conclusive evidence] is essentially for."[48]

The State nevertheless argued that Keys's playing of the rap song made it more probable that Keys was one of the shooters in the charged incidents. The trial court agreed. But other than to remark that the evidence "tend[s] to prove . . . that Kyair Keys is a shooter[],"[49] and that, by posting the Instagram video, he demonstrated "that's how he would like to be known,"[50] the court did not explain how the audio evidence[51] tended to show that Keys participated in the shootings for which he was being tried. More than that, the trial court's remarks, rather than establishing that the evidence fell within the proof-of-identity exception set forth in Rule 404(b)(2), confirmed that, if the evidence was probative of anything, it was that Keys had a propensity to shoot at people indiscriminately.

The trial court, as mentioned above, agreed with the State that the lyrics did not refer to a specific crime, wrong, or other act and, moreover, that there was "really no evidence that [Keys] did any of these other things except by reference in a song,"

---

[48] *Id.*

[49] *Id.* at A765.

[50] *Id.*

[51] To be clear, our review is limited to the trial court's admission of the audio portion and not the video portion of the Instagram post. Keys has not questioned the admissibility of the video portion showing Keys in the Charger that had been stolen earlier that day in Philadelphia.

whose author and performer had no demonstrated connection to Keys.[52] These observations, in our view, should have triggered a threshold examination of the relevance of the rap song under D.R.E. 401 and its probative value and prejudicial effect under D.R.E. 403 without regard to Rule 404(b).

The trial court's comments, read in the aggregate, suggest that the court harbored grave doubts that the evidence, leaving propensity aside, met Rule 401's relevance standard—that is, that the rap song lyrics made it more probable than not that Keys was a shooter in the charged incidents. But assuming that the evidence was marginally relevant to the identity of the shooter—a questionable premise, in our view—it seems plain to us that any such relevance was substantially outweighed by a danger of unfair prejudice and confusing the issues. In sum, we believe that the better approach to the evidentiary issue the trial court confronted would have been to exclude the evidence as irrelevant or, in the alternative, substantially more prejudicial than probative of a contested fact.

Yet the trial court saw it differently, applying the Rule 404(b) framework and finding that, though the evidence could be viewed as propensity evidence—referring, in the court's words, to something the defendant would do presumably

---

[52] App. to Opening Br. at A764.

based on something he has done—it could be offered to prove the identity of one of the shooters in the charged incidents. This ruling rests, in our view, on shaky footing.

First of all, the rap-song lyrics, read literally, do not describe Keys participating in a shooting. And even as the lyrics were interpreted by Detective Wham, they still say nothing more than that Keys held some allegiance to a group associated with the singer and arguably that he possessed a firearm—the "draco." The trial court, as outlined above, seemed uncertain as to what "other crime, wrong, or other act" the lyrics imputed to Keys. Even so, the court tethered its application of Rule 404(b) to its belief that the song referred "to shooting inferentially."[53]

It bears repeating here that to use evidence of prior bad acts for a permitted purpose under Rule 404(b)(2), the defendant's commission of those acts must be proved by evidence that is plain, clear, and conclusive.[54] Here, the parties and the court acknowledged that the rap song lyrics did not identify with any clarity another "crime, wrong, or act," and as mentioned, the court commented on the absence of "evidence that [Keys] did any of these other things . . . ."[55] We cannot square the court's findings and the parties' admissions—not to mention our independent review—with the court's determination that the rap song lyrics amounted to plain,

---

[53] App. to Opening Br. at A761.
[54] *Getz*, 538 A.2d at 734.
[55] App. to Opening Br. at A764.

clear, and conclusive evidence that Keys had committed other crimes, wrongs, or acts within the meaning of Rule 404(b). And as we explained earlier, "the probative force of the evidence" as to the identity of the shooters in the charged incidents—a factor to be considered under *DeShields*—was particularly weak. We conclude therefore that the trial court abused its discretion by admitting the audio portion of the Instagram post. We address next whether the error justifies reversal of Keys's convictions.

C

The State argues that, even if the Superior Court abused its discretion in allowing the jury to hear the controversial rap song, the error was harmless and does not warrant reversal of Keys's convictions. As we have previously observed, "[n]ot all errors call for reversal."[56] In determining whether an error is harmless, we distinguish between those that are constitutional in nature and those involving a discretionary decision to admit evidence:

> When evidence has been admitted erroneously, we first distinguish between ordinary evidentiary missteps and errors of constitutional magnitude. When the error does not implicate constitutional rights, "[t]he well-established rule is that where the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction, error in admitting the evidence is harmless." But when . . . the error violated the defendant's constitutional rights, an error is harmless only if the

---

[56] *Buckham v. State*, 185 A.3d 1, 13 (Del. 2018).

State proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[57]

Here, the error is not of constitutional magnitude. We therefore look to the properly admitted evidence to determine whether it is sufficient to sustain Keys's convictions.

The central factual issue at trial was the identity of the shooter in the three shooting incidents for which Keys was convicted. Each of the incidents was captured, to one extent or another, by surveillance cameras. As outlined above, the clothing worn by one of the shooters resembled the clothing Keys was wearing when he was arrested. Ballistics evidence showed that the .40 caliber Smith & Wesson firearm found in the Dodge Charger at the time of Keys's arrest matched the casings found at the scene of the January 14 daycare shooting. Similar evidence linked the 9-millimeter Polymer80 firearm found on the Charger's floorboard to the January 22 BP gas station shooting. Cell phone location data placed Keys at two of the three shooting scenes. Keys's presence in the stolen Charger as evidenced by the Instagram video linked him to the gray Mazda—left behind when the Charger was stolen in Philadelphia—seen on the video of the BP shooting. This evidence was

---

[57] *Taylor v. State*, 260 A.3d 602, 618 (Del. 2021) (alteration in original) (first quoting *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991); and then quoting *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992)). This is not to say that the discretionary admission—that is, evidence objectionable for reasons other than a constitutional violation of—highly prejudicial evidence can never warrant reversal when the proper admission of other evidence is sufficient to sustain the conviction. Indeed, we have recognized that the use of evidence "in a prejudicial manner can result in a basic unfairness that rises to the level of a violation of a defendant's due process rights." *Charbonneau v. State*, 904 A.2d 295, 320 n.69 (Del. 2006).

sufficient to prove beyond a reasonable doubt that Keys was a shooter in each of the charged incidents[58] and to sustain his convictions. Consequently, the admission of the audio portion of Keys's Instagram post was harmless error.

## IV

For the reasons set forth above, we affirm Keys's convictions.

---

[58] We note that, in support of his argument that the audio evidence from the Instagram post was cumulative and thus unnecessary—one of the factors to be considered under *DeShields*—Keys has argued that, because of the other evidence (ballistics, cell phone data, clothing), "[t]he State did not need the Instagram audio." Reply Br. at 5. We agree.